# UNITED STATES DISTRICT COURT
## FOR THE
## MIDDLE DISTRICT OF FLORIDA

**COMPLAINT**

MICHAEL CALDIERO,                    )
)
)
)
                         **Plaintiff,**    )
)
                                           )    **Civil Action No.:** _____
        *-Against-*                        )
)
**WELLS FARGO BANK, N.A.,**                )
)
                      **Defendant.**       )
)

Plaintiff, by and through counsel CIVIL RIGHTS CONSORTIUM, respectfully allege the following:

### PRELIMINARY STATEMENT

Plaintiff brings the instant action for relief from the Defendant Wells Fargo Bank, N.A. wrongful and discriminatory and retaliatory termination of employment, all in violation of the laws and constitution of the United States, and State of Florida, where Plaintiff was terminated at least in part for perceived whistleblowing and because Plaintiff was over the age of 40, as described herein.

### JURISDICTION

1.      This Court has federal question jurisdiction over the instant action pursuant to 28 U.S. Code § 1331, as this action presents federal questions as to 42 U.S.C. § 1983. Moreover, the Court has supplemental jurisdiction pursuant to 28 U.S. Code § 1367, as to the Human Rights Laws of the State of Florida.

## VENUE

2.      Pursuant to 28 U.S.C. § 1391, the venue is proper as the material events have taken place in this judicial district.

## JURY DEMAND

3.      Plaintiff respectfully demands a trial by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PARTIES

4.      Plaintiff MICHAEL CALDIERO is a citizen of the State of Florida, over the age of forty, who worked for Wells Fargo Bank, N.A. for nearly fourteen (14) years at the time of his wrongful termination.

5.      WELLS FARGO BANK, N.A., is the employer that wrongfully terminated Mr. Caldiero on or about March 10, 2023.

## FACTUAL BACKGROUND

6.      In November 2009, Plaintiff, Michael Caldiero began his employment with Wells Fargo Bank, N.A. (hereinafter referred to as "WFB"), working as a Senior Portfolio Manager ("SPM") in WFB's Government Portfolio Banking Division.

7.      Mr. Caldiero worked in WFB's Government Portfolio Banking Division, providing exceptional service until about January 2022, when he transferred to WFB's Commercial Portfolio Banking Division.

8.      In about September or October 2021, Mr. Caldiero interviewed to work in WFB's Middle Market Commercial and Industrial Group (hereinafter referred to as "Commercial Portfolio Bank Division").

9.      At that time, Mr. Caldiero interviewed with Rachel Ben-David (Credit Team Manager), John Fair (Credit Team Manager), Kim Mullins (Market Credit Leader), Tyler Niermann (Market Credit Leader), and Eric Montgomery (Market Credit Leader) (collectively, "the Commercial Credit Team").

10.     As members of the Credit Team of Well Fargo Bank's Commercial Portfolio Banking Division, the Commercial Credit Team worked to facilitate WFB's commercial lending to private companies.

11.     During the interview, Mr. Caldiero discussed his credentials and the differences between the Commercial Portfolio Banking Division and its Government Portfolio Banking Division.

12.     The Commercial Credit Team explained to Mr. Caldiero that as a result of those differences, Mr. Caldiero would need to have training and guidance to facilitate his transition from the Government Portfolio Banking Division to the Commercial Portfolio Banking Division.

13.     In December 2021, Mr. Caldiero received his offer letter to work in the Commercial Portfolio Banking Division.

14.     On January 10, 2022, Mr. Caldiero began working in the Commercial Portfolio Banking Division.

15.     From January 2022 to April 2022, Mr. Caldiero reported to Rachel Ben-David.

16.     For the first several months, Mr. Caldiero was not provided with any training or guidance, including what was discussed during his interview to become a member of the Commercial Portfolio Banking Division.

17.     In about April or May 2022, WFB shifted its Orlando Credit Team during which Ms. Ben-David's regional coverage was realigned such that Mr. Caldiero now reported to John Fair.

18.     During the same period, Mr. Fair discovered online training and recommended such to Mr. Caldiero, but noted to Mr. Caldiero that Mr. Fair was unsure how helpful the training would be to Mr. Caldiero's transitioning to the practices of the Commercial Portfolio Banking Division.

19.     At no time during Mr. Caldiero's new role had he received any meaningful guidance or training, and with WFB's tight work deadlines, Mr. Caldiero was unable to complete the online training.

20.     In July 2022, Mr. Fair conducted Mr. Caldiero's mid-year performance review and concluded that Mr. Caldiero's performance was a "Meets," a satisfactory job performance.

21.     During this assessment, Mr. Fair met with Mr. Caldiero and noted that WFB's practice was that during the year following an employee's transfer to a new assigned division or new role, such an employee he would be allowed to get acclimated to the new divisional practices, learning what it takes and what is needed to perform at the level expected.

22.     However, Mr. Caldiero would never get this one-year beneficial period, as his penchant for transparency in credit reporting, because an "issue."

23.      One of the fundamental functions with the Commercial Portfolio Banking Division, was the preparation of the *Borrower Qualified Rating Assessment* ("BQR").

24.     The function of the BQR was instrumental in facilitating private commercial lending.

25.     While working in WFB's Government Portfolio Banking Division, Mr. Caldiero learned that it was better to provide more information than not enough information.

26.     Mr. Caldiero had learned that it was essential that the BQR be able to stand on its own, if read by a layperson.

27.     However, Mr. Fair soon began to take issue with Mr. Caldiero's practice of providing more information in the BQR.

28.     As such, it was made clear to Mr. Caldiero that the Commercial Portfolio Banking Division wanted him to provide less information, not to be transparent in preparing the BQR.

29.     Concerned with the sort of problems that could result in being less transparent (i.e., possibly resulting in predatory lending or lending on improper fundamentals), that WFB's Risk Audit Review Division could take issue with such, Mr. Caldiero raised the issue with Mr. Fair on a number of occasions.

30.     As a result of Mr. Caldiero's doing so, the warnings about his job performance began.

31.     First, Mr. Fair issued Mr. Caldiero an informal warning, through email. The informal warning conflicted with Mr. Fair's telling Mr. Caldiero that pursuant to WFB's employment division reassignment practice, Mr. Caldiero would have 1-year lead time to assimilate to the practices of the Commercial Portfolio Banking Division.

32.     In that regard, Mr. Fair stated that going forward he and Mr. Caldiero would meet regularly to go over Mr. Caldiero's credit reporting work, and progress.

33.     However, after two sessions (i.e., two meetings), there were no more meetings.

34.     Despite the relatively brief time between warnings and the absence of meetings, Mr. Fair issued Mr. Caldiero a formal warning, again stating that the warning would accompany meetings as to Mr. Caldiero's credit reporting work, and progress.

35.     Given the inconsistency between Mr. Fair's warnings, lack of meaningful guidance, and no training, Mr. Caldiero filed a complaint with WFB's Human Resources.

36.     Thereafter, Mr. Fair stopped communicating with Mr. Caldiero, and Mr. Fair simply updated the credit reports without explanation to Mr. Caldiero.

37.     In about January 2023 to February 2023, WFB asked Mr. Caldiero what training he was interested, to which Mr. Caldiero noted several areas of interest.

38.     However, Mr. Fair, still seething as a result of the complaint, had been excluding Mr. Caldiero from meetings.

39.     When bonuses and raises were later distributed, Mr. Caldiero did not receive either a bonus or a raise, without an explanation.

40.     On March 10, 2023, Mr. Caldiero was terminated by Tyler Niermann, John Fair's manager.

41.     As part of the realignment of the Orlando Credit Team, Mr. Niermann became Mr. Fair's manager, to whom Mr. Fair directly answered.

## <u>CAUSES OF ACTION</u>

### FIRST CAUSE OF ACTION

**Plaintiff brings a claim pursuant to 42 U.S.C. § 1983 and Florida Human Rights Law for retaliation and age discrimination, where, as a member of a protected class (i.e., on 40 years of age or older), the retaliated against Plaintiff and discriminated as to Plaintiff's age.**

42.    Plaintiff repeats and restates as if stated herein all averments set forth in Paragraphs "1" through "41" above.

43.    Plaintiff, a person who is over the age of forty, is a member of a protected class.

44.    Defendant retaliated against the Plaintiff as a result of the Plaintiff's having filed a complaint with HR, and where Plaintiff openly questioned the practice of being less transparent in the BQR.

45.    Additionally, WFB's failure to provide meaningful training or guidance to Plaintiff because he is over the age of forty.

46.    Plaintiff was injured as a result of the Defendant's discrimination and retaliation.

### SECOND CAUSE OF ACTION

**Plaintiff WFB brings a claim of breach of the implied duty of good faith and fair dealing, where Defendant fabricated the basis for Plaintiff's termination, denial of bonus and raise.**

47.    Plaintiffs repeat and restate as if stated herein all averments set forth in Paragraphs "1" through "46" above.

48.    The parties were party to the underlying employment contract, with Defendant as employer and Plaintiff, as employee.

49.     Therefore, under the law of the State of Florida, WFB had an implied duty not to engage in any conduct that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, such that an employee can be expect to report practice that are potentially unlawful or predisposed to becoming unlawful practice, without such employees being subjected dot discipline and/or termination.

50.     The Defendant unjustifiably impeded the Plaintiff's rights under the employment relationship by not providing due guidance and training and fabricating the basis for termination and claims of inefficient performance.

51.     As a result, the Plaintiff was injured in the contract, initially with lack of meaningful guidance and no training, then in fabricating claims of Plaintiff's deficient performance, denial of bonus and a raise, and ultimately the basis for the Plaintiff's termination.

## <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a)    Awarding compensatory damages of $1,500,000, and punitive damages to be proved at trial;

(b)    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the state law, including moving expenses to plaintiffs;

(c)    Awarding the plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)    Such other and further relief as this Court may deem just and proper.

Dated: Woodhaven, New York,
       May 5, 2023

*Michael Caldiero*

Michael Caldiero, *pro se*
c/o Civil Rights Consortium
195 Maplewood Ave, No. 324
Maplewood, New Jersey 07040
(855) 246-2776, Ext. 702